# No. 24-50925

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID DAVALOS,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Western District of Texas

————————————

**Brief of Defendant-Appellant**

————————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
Tel.: (210) 472-6700
Fax: (210) 472-4454

KRISTIN L. DAVIDSON
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

## Certificate of Interested Persons

### UNITED STATES v. DAVID DAVALOS,
### No. 24-50925

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **David Davalos,** Defendant-Appellant;

2. **Margaret F. Leachmen,** acting U.S. Attorney;

3. **Jaime Esparza** and **Ashley C. Hoff,** former U.S. Attorneys;

4. **Justin R. Simmons, Russell Leachman,** and **Ray Gattinella,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

5. **Maureen Scott Franco,** Federal Public Defender;

6. **Marina Thais Douenat,** Assistant Federal Public Defender, who represented Defendant-Appellant in the district court; and

7. **Kristin L. Davidson,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Kristin L. Davidson
KRISTIN L. DAVIDSON
*Attorney for Defendant-Appellant*

i

## Request for Oral Argument

David Davalos requests oral argument. He argues that the district court erroneously denied his motion to suppress the evidence discovered after the police officer conducted a warrantless search of his car, which was parked within the curtilage of his home. Given the importance of the constitutional question, oral argument would allow the parties to answer questions the Court may have about the applicable law and relevant facts.

# Table of Contents

Certificate of Interested Persons.......................................................... i

Request for Oral Argument ................................................................. ii

Table of Authorities........................................................................... v

Subject Matter and Appellate Jurisdiction ...................................... 1

Statement of the Issue........................................................................ 2

Statement of the Case......................................................................... 3

Summary of the Argument ............................................................... 13

Argument and Authorities................................................................ 16

    The district court erred by failing to suppress evidence
    obtained after the unlawful search of Davalos's car, which
    was parked on the curtilage of his small, urban home. .......... 16

    A.  Standard of review. ............................................................. 16

    B.  The initial search of Davalos's car violated the Fourth
        Amendment because Trooper Johnson invaded the
        curtilage of his small, urban home.................................... 17

        1.  The Fourth Amendment's protection of the home
           extends to its "curtilage," but not "open fields." .......... 18

        2.  Davalos's car was parked within his home's
           curtilage...................................................................... 24

    C.  No exception to the Fourth Amendment's warrant
        requirement justified Trooper Johnson's invasion of
        the curtilage...................................................................... 33

        1.  There was no reasonable, articulable suspicion that
           the officers were in danger. ......................................... 34

        2.  There was no "hot pursuit" of Davalos........................ 41

Conclusion....................................................................................... 44

Certificate of Compliance with Type-Volume Limit........................ 45

# Table of Authorities

## Cases

*Brigham City v. Stuart,*
  547 U.S. 398 (2006) ................................................................. 34

*California v. Ciraolo,*
  476 U.S. 207 (1986) ................................................................ 19

*California v. Greenwood,*
  486 U.S. 35 (1988) ................................................................. 21

*Collins v. Virginia,*
  584 U.S. 586 (2018) ........................................................*passim*

*Commonwealth v. Thomas,*
  267 N.E.2d 489 (Mass. 1971) ................................................ 26

*Cooper v. Brown,*
  844 F.3d 517 (5th Cir. 2016) ................................................. 39

*Dow Chemical Co. v. United States,*
  476 U.S. 227 (1986) ................................................................ 20

*Florida v. Jardines,*
  569 U.S. 1 (2013) ..............................................................*passim*

*Horton v. United States,*
  541 A.2d 604 (D.C. Ct. App. 1988)........................... 24, 25, 30, 31

*Illinois v. Gates,*
  462 U.S. 213 (1983) ................................................................ 40

*Kentucky v. King,*
  563 U.S. 452 (2011) ................................................................ 34

*Lange v. California,*
  594 U.S. 295 (2021) ........................................................*passim*

*Maryland v. Buie,*
  494 U.S. 325 (1990) ....................................................11, 12, 34, 38

*Miller v. United States*,
    357 U.S. 301 (1958) ................................................................ 33

*Morgan v. Fairfield County*,
    903 F.3d 553 (6th Cir. 2018) ................................... 27, 37

*Murray v. United States*,
    487 U.S. 533 (1988) ................................................................ 43

*Oliver v. United States*,
    466 U.S. 170 (1984) ..................................................*passim*

*Ornelas v. United States*,
    517 U.S. 690 (1996) ................................................................ 17

*Rowley v. McArthur*,
    2018 WL 6788528, (D. Utah Dec. 26, 2018) ......................... 28, 29

*Sauceda v. Lopez*,
    125 F.4th 634 (5th Cir. 2025) ....................................... 24

*Scher v. United States*,
    305 U.S. 251 (1938) ........................................ 11, 12, 42

*Scott v. Harris*,
    550 U.S. 372 (2007) ................................................................ 17

*Silverman v. United States*,
    365 U.S. 505 (1961) ................................................. 13, 18

*Tamez v. City of San Marcos, Texas*,
    118 F.3d 1085 (5th Cir. 1997) ..................................... 17

*Terry v. Ohio*,
    392 U.S. 1 (1968) ........................................... 11, 12, 39

*United States v. Acosta*,
    965 F.2d 1248 (3d Cir. 1992) ........................ 25, 27, 31, 32

*United States v. Aguirre*,
    664 F.3d 606 (5th Cir. 2011) ....................................... 36

*United States v. Alexander*,
    888 F.3d 628 (2d Cir. 2018) ........................ 27, 28, 29, 31

*United States v. Arboleda,*
   633 F.2d 985 (2d Cir. 1980).........................................................26

*United States v. Beene,*
   818 F.3d 157 (5th Cir. 2016) ......................................................24

*United States v. Carter,*
   360 F.3d 1235 (10th Cir. 2004) ..................................................38

*United States v. Cherry,*
   759 F.2d 1196 (5th Cir. 1985) ....................................................43

*United States v. Daniels,*
   930 F.3d 393 (5th Cir. 2019) ......................................................36

*United States v. Diehl,*
   276 F.3d 32 (1st Cir. 2002).........................................................29

*United States v. Dunn,*
   480 U.S. 294 (1987) ............................................................*passim*

*United States v. Gould,*
   364 F.3d 578 (5th Cir. 2004)................................................34, 35

*United States v. Guerrero-Barajas,*
   240 F.3d 428 (5th Cir. 2001)................................................39, 41

*United States v. Guzman,*
   739 F.3d 241 (5th Cir. 2014) ......................................................17

*United States v. Hearn,*
   563 F.3d 95 (5th Cir. 2009) ........................................................17

*United States v. Holley,*
   831 F.3d 335 (5th Cir. 2016) ......................................................24

*United States v. Mata,*
   517 F.3d 279 (5th Cir. 2008) ......................................................36

*United States v. Menchaca-Castruita,*
   587 F.3d 283 (5th Cir. 2009)................................................37, 38

*United States v. Newman,*
   472 F.3d 233 (5th Cir. 2006)..........................................35, 36, 40

*United States v. Romano,*
  388 F. Supp. 101 (E.D. Pa. 1975) ................................................ 25

*United States v. Wells,*
  648 F.3d 671 (8th Cir. 2011) .................................................. 30, 31

*United States v. Wright,*
  57 F.4th 524 (5th Cir. 2023) ........................................................ 17

## Constitutional Provisions

U.S. Const. amend IV ............................................................*passim*

## Statutes

18 U.S.C. § 922(g)(1) ...................................................................... 3

18 U.S.C. § 3231 ............................................................................. 1

18 U.S.C. § 3742 ............................................................................. 1

28 U.S.C. § 1291 ............................................................................. 1

## Rules

Fed. R. App. P. 4(b)(1)(A)(i) ........................................................... 1

Fed. R. App. P. 32(a)(5) ................................................................ 45

Fed. R. App. P. 32(a)(6) ................................................................ 45

Fed. R. App. P. 32(a)(7)(B) ........................................................... 45

Fed. R. App. P. 32(f) ..................................................................... 45

## Other Authority

4 W. Blackstone,
  Commentaries on the Laws of England (1769) .................... 18, 27

## Subject Matter and Appellate Jurisdiction

**1. Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court exercised jurisdiction under 18 U.S.C. § 3231.

**2. Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the United States District Court for the Western District of Texas, entering judgment of criminal conviction and sentence under the Sentencing Reform Act of 1984. This Court has jurisdiction of the appeal under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file a notice of appeal in the district court within 14 days after the judgment's entry. Fed. R. App. P. 4(b)(1)(A)(i). Here, the court entered judgment on November 12, 2024. ROA.9. Davalos filed his notice of appeal on November 15, 2024. ROA.10, 236.

## Statement of the Issue

Davalos had already parked his car on his driveway, a few feet away from his home, when an officer initiated a traffic stop for minor traffic violations. After Davalos followed the officer's instruction to walk to the street, the officer entered Davalos's private property to inspect his car, which ultimately led to the discovery of a firearm. Did the officer violate the Fourth Amendment by entering the curtilage of Davalos's home to search his car?

## Statement of the Case

David Davalos had already returned to his small, urban home and parked his car on the driveway before Trooper Johnson initiated a traffic stop for a minor traffic violation. Trooper Johnson ordered Davalos to walk to the street, and Davalos peaceably complied. Trooper Johnson then entered Davalos's private property to investigate Davalos's car, at which point he smelled marijuana and saw evidence of tampering on the driver's side door panel. After this initial search, Trooper Johnson ultimately dismantled the car door and found a hidden firearm. The district court erred in denying Davalos's motion to suppress evidence that flowed from the initial warrantless search of his car because it was parked within the home's curtilage and no exigencies existed.

**1. Indictment.** Davalos was charged with one count of possessing a firearm knowing he had been previously convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). ROA.35–36.

**2. The motion to suppress.** Davalos moved to suppress all evidence discovered as the result of the initial, unlawful search of Davalos's car. ROA.81–88. He argued that Davalos and his car were within the curtilage of his home when Trooper Johnson initiated a

traffic stop for minor traffic violations, and thus Trooper Johnson needed a warrant before approaching and searching his car. ROA.84–88. Because incriminating evidence flowed directly from the initial, unlawful search, that evidence must be suppressed. ROA.88. The Government responded that Davalos consented to the search, Trooper Johnson had reasonable suspicion to search the car under the automobile exception, and exigent circumstances justified Trooper Johnson's actions. ROA.118–35.

**3. The suppression hearing.** A magistrate judge held a hearing on Davalos's motion to suppress, at which the Government called Trooper Johnson. In addition to live testimony, the parties relied on video of the traffic stop—from Trooper Johnson's body camera (Gov. Ex. 1) and his dash camera (Def. Ex. 1)—as well as a photograph of the front of Davalos's house (Def. Ex. 2).[1]

---

[1] The parties' exhibits were admitted into evidence at the suppression hearing, and the admissions are reflected in the hearing's minute notes. *See* ROA.257, 272, 285, 394.

The video evidence reflects that Davalos lives in a humble, urban neighborhood—the single-family homes are closely situated on small lots close to the road. *See* Def. Ex. 1 (1:47–1:59) (character of the residential block visible from dash camera). There do not appear to be fences or gates surrounding the fronts of the homes, and cars are parked either on the short driveways immediately next to the homes or on the public street. *Id.* Davalos's home is no exception.



Gov't Ex. 1 (00:37); *see also* ROA.259–60.

Davalos's private driveway runs the length of the small lot and is immediately adjacent and connected to his home. A public sidewalk runs in front of the house but ends at the edge of Davalos's

driveway. A separate pathway connects the sidewalk to the home's front door. No separate pathway connects the driveway to the front door, but the driveway extends to the back of the house. There is no dispute that Davalos was parked within the boundary of his private property. *See* ROA.284–86; Def. Ex. 2.

Unbeknownst to Davalos, he was being surveilled on June 16, 2022, by DEA agents as he ran errands. ROA.278–79. Those agents watched him place a plastic bag in the trunk of his car at a tire shop and then radioed Trooper Johnson to perform a traffic stop on Davalos's white Lincoln Town Car for failure to signal a lane change. ROA.254–55, 271. However, the Government presented no evidence that indicated Davalos was actively engaged in drug trafficking or other criminal activity.[2] And there was no evidence presented during the hearing that the surveilling agents observed anyone else in the car with Davalos.

Trooper Johnson testified that he had been told over the radio that Davalos had committed a traffic violation—changing lanes without a signal. ROA.271. Trooper Johnson's dash camera reflects

---

[2] Trooper Johnson confirmed that the DEA agents' observation of Davalos placing a plastic bag in his trunk was not probable cause to search the car. ROA.288.

that Davalos's car was not visible during much of the pursuit, and he had to take direction from other agents who were driving cars ahead of him. *See* ROA.273–74; Def. Ex. 1 (00:00–01:56). Trooper Johnson initiated his lights when he pulled up behind Davalos who, by that time, had already parked on his driveway. ROA.256, 272–77, 293–94; Gov't Ex. 1 (00:30 and clip 1); Def. Ex. 1 (01:49–01:57).

Trooper Johnson, as well as a second officer accompanying him, got out of their car, and Trooper Johnson ordered Davalos to do the same, although Davalos was already in the process of getting out of his car at that point. ROA.256–57, 260; Gov't Ex. 1 (clip 1 at 00:01–00:02, 00:10–00:18). Trooper Johnson instructed Davalos to tell any passenger to get out of the car, and Davalos answered that "nobody" else was in the car. Gov't Ex. 1 (clip 1 at 00:07–00:12). Trooper Johnson then ordered Davalos to come to street, and Davalos peaceably complied. ROA.258, 260; Gov't Ex. 1 (clip 1 at 00:05–00:07).

Once Davalos got to the street, Trooper Johnson told him that he had failed to signal multiple times and requested Davalos's license and proof of insurance. ROA.260; Gov't Ex. 1 (clip 1 at 00:18–00:28). Davalos said that his proof of insurance was in the car. ROA.260; Gov't Ex. 1 (clip 1 at 00:27–00:28).

At that point, Trooper Johnson ordered Davalos to stay at the police car, told the second officer to watch Davalos, and entered Davalos's property. ROA.262–63, 280–81; Gov't Ex. 1 (clip 1 at 00:32; clip 2 at 00:00–00:19). He walked to Davalos's car and knocked on it, before walking to the driver's side door to look inside. ROA.263; Gov't Ex. 1 (clip 2 at 00:16–00:19). Trooper Johnson testified that, at that point, he smelled marijuana and noticed that the driver's side door may have been tampered with. ROA.263. Trooper Johnson testified that he searched the car out of concern for officer safety because the car windows were tinted.[3] ROA.258, 262.

Trooper Johnson returned to the street before ordering Davalos to return to his car to get his registration. ROA.264; Gov't Ex. 1 (clip 3). Trooper Johnson accompanied Davalos because he wanted to smell the car again for marijuana. ROA.265. Trooper Johnson testified that he again smelled marijuana at the car, saw ashes throughout the car, and thought the door panels had been tampered with. ROA.266.

---

[3] Trooper Johnson did not include any concerns for officer safety as justifications for his action in his police report. ROA.286.

8

Davalos retrieved his registration and insurance from the car, and then Trooper Johnson ordered him back to the street to continue the interview. ROA.265–67; Gov't Ex. 1 (clips 4–6). Trooper Johnson asked whether Davalos had just smoked some marijuana, and Davalos admitted he had and still had "a little bit of weed" in his pocket. ROA.267–68. Davalos gave Trooper Johnson the weed from his pocket and Trooper Johnson conducted a pat-down. ROA.268. Trooper Johnson then told Davalos, "we will be conducting a vehicle search due to the odor of marijuana." ROA.269; Gov't Ex. 1 (clip 8 at 00:00–00:04). Trooper Johnson confirmed that he was not asking for permission but was telling Davalos that he was going to search the car. ROA.283.

Trooper Johnson then conducted a search of Davalos's car, during which he found a handgun hidden inside the car's front door panel and a small amount of marijuana. ROA.269–70; Gov't Ex. 1 (clip 9).

**4. The magistrate judge's report and recommendation.**
The magistrate judge entered a report and recommendation for the district court to deny Davalos's motion to suppress. ROA.162–72. First, the magistrate judge concluded that the driveway where Da-

valos was parked was not part of the home's curtilage, and distinguished this case from *Collins v. Virginia*, 584 U.S. 586 (2018). ROA.166–68. In *Collins*, the Supreme Court first held that a motorcycle parked on the home's driveway and in plain view from the street was within the home's curtilage. *Id.* at 593–94. Then, the officer's warrantless intrusion on the home's curtilage was not justified under the automobile exception to the Fourth Amendment's warrant requirement. *Id.* at 598. The magistrate judge reasoned that, unlike the curtilage in *Collins*, there was no driveway enclosure, and the driveway where Davalos parked was at the front of the house. ROA.166–67. Applying *United States v. Dunn*, 480 U.S. 294 (1987), the magistrate judge concluded that all four *Dunn* factors weighed against a finding that Davalos's driveway was part of the home's curtilage. ROA.167–68. Because the driveway was not part of the curtilage, the magistrate judge held that Trooper Johnson was "entitled to approach the vehicle as part of the lawful stop," and the odor of marijuana then created the necessary probable cause to search the car. ROA.168.

Alternatively, even if the driveway was part of the curtilage, the magistrate judge concluded that exigencies justified the initial search of the car based on officer safety—under *Terry v. Ohio*, 392

U.S. 1 (1968) and *Maryland v. Buie*, 494 U.S. 325 (1990)—and because Trooper Johnson was in "hot pursuit" of Davalos under *Scher v. United States*, 305 U.S. 251 (1938). ROA.168–71.

The magistrate judge recommended that the district court deny Davalos's motion to suppress. ROA.171.

**5. Davalos's objections.** Davalos objected to the magistrate judge's report and recommendation. ROA.173–88. First, he argued that the warrantless searches Trooper Johnson conducted were illegal under *Collins* and *Florida v. Jardines*, 569 U.S. 1 (2013), and the magistrate judge erroneously concluded that the driveway was not part of the home's curtilage. ROA.175–81. Under the magistrate judge's mechanical application of *Dunn* and rejection of *Collins* and *Jardines*, a small home in a humble neighborhood would never receive the same Fourth Amendment protections as a wealthy, secluded estate or a home in a rural area. ROA.179–81. Second, Davalos argued that the magistrate judge failed to address that the seizure of Davalos off his property also amounted to an unlawful Fourth Amendment seizure of his person. ROA.181–82. Third, he argued that the magistrate judge erroneously concluded that, even if the driveway was part of the curtilage, Trooper Johnson's actions were justified by exigent circumstances. ROA.182–86. Davalos

pointed out that, if the driveway is considered curtilage, neither the *Terry* nor *Buie* principles justified entry into the home or curtilage. ROA.182–83. And the magistrate judge's reliance on *Scher* was misplaced because there was no "hot pursuit" justification under *Lange v. California*, 594 U.S. 295 (2021), and *Collins*. ROA.183–84. Finally, Davalos noted that the magistrate judge did not reach a conclusion on whether the exclusionary rule applied. ROA.186.

**6. The district court's order.** The district court adopted the magistrate judge's report and recommendation without change and denied Davalos's motion to suppress. ROA.201.

**7. Conditional plea and sentencing.** Davalos pleaded guilty to the indictment pursuant to a conditional plea agreement. ROA.347–56. By the terms of the agreement, Davalos preserved the right to appeal the ruling on his suppression motion. ROA.347. The district court sentenced Davalos to time served, followed by three years' supervised release. ROA.231–32.

**8. Appeal.** Davalos appealed. ROA.236.

## Summary of the Argument

**The district court erred by failing to suppress evidence obtained after the unlawful search of Davalos's car, which was parked on the curtilage of his small, urban home.**

At the core of the Fourth Amendment stands the "right of a [person] to retreat into [their] home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). To give "full practical effect to that right," the Fourth Amendment's protections of the house extend to its curtilage—"the area 'immediately surrounding and associated with the home.'" *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). In *Collins*, the Supreme Court held that the automobile exception to the Fourth Amendment's warrant requirement did not authorize a police officer to search a motorcycle parked on a residential home's curtilage. 584 U.S. at 593, 598. And in *Jardines*, the Supreme Court clarified that police officers do not have an implied license to enter a home's front curtilage to engage in an investigative search. 569 U.S. at 7–9. But that is what happened in this case. Trooper Johnson entered the curtilage of Davalos's small, urban home without a warrant to search his parked car.

The district court erred in denying Davalos's motion to suppress evidence because it found that Davalos's car was not parked on the home's curtilage. It mechanically applied factors from *United States v. Dunn*, 480 U.S. 294 (1987), which were first developed to distinguish where a home's curtilage ends and an open field begins on a large, rural farm. But the court failed to adjust the *Dunn* factors to the urban character of Davalos's small, residential home, and it ignored that the curtilage analyses of the urban, residential homes in *Collins* and *Jardines* had no need for the *Dunn* factors.

The district court also erred in its alternative holding that, if Davalos was parked within the curtilage of his home, exigent circumstances justified Trooper Johnson's search of the car based on officer safety and because he was in "hot pursuit" of Davalos. Not so. No evidence established a reasonable threat to officer safety or probable cause of a crime or contraband inside the car. And Davalos was not in flight. He had been stopped for minor traffic violations and was peaceably complying with Trooper Johnson's instructions. Under *Lange v. California*, 594 U.S. 295 (2021), Trooper Johnson was not in hot pursuit and his unlawful invasion of Davalos's curtilage was not justified.

This Court should reverse the district court's order denying Davalos's motion to suppress and vacate his conviction.

## Argument and Authorities

**The district court erred by failing to suppress evidence obtained after the unlawful search of Davalos's car, which was parked on the curtilage of his small, urban home.**

An open-aired parking area closely connected to a small home in a modest, urban neighborhood "is no less entitled to protection from trespass and a warrantless search than a fully enclosed garage." *Collins v. Virginia*, 584 U.S. 586, 600 (2018). That is because even "the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion." *Id.* (cleaned up). Thus, a person cannot be deprived of their constitutional right to be free from an unreasonable search simply because they happen to live in a particular area or lack resources to erect high fences or enclose vehicles parked close to a small urban home. *See id.* Yet that is what happened here. Trooper Johnson violated Davalos's Fourth Amendment rights when, without a warrant, he entered the curtilage of Davalos's home to search his car. The district court erred when it refused to suppress the evidence discovered after that initial search.

### A. Standard of review.

When a district court denies a motion to suppress, this Court reviews the factual findings for clear error and legal conclusions

about the constitutionality of the conduct of law enforcement officers *de novo*. *United States v. Guzman*, 739 F.3d 241, 245 (5th Cir. 2014). Whether facts sufficiently establish probable cause or exigent circumstances to justify a warrantless search are legal questions also reviewed *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 696–97 (1996); *United States v. Hearn*, 563 F.3d 95, 103 (5th Cir. 2009); *Tamez v. City of San Marcos, Texas*, 118 F.3d 1085, 1094 (5th Cir. 1997).

Although the Court views the evidence in the "light most favorable to the prevailing party" and considers live testimony as "particularly strong," "where testimony conflicts with video evidence" the Court views the "facts in the light depicted by the videotape." *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) (cleaned up); *Scott v. Harris*, 550 U.S. 372, 378, 380–81 (2007).

**B. The initial search of Davalos's car violated the Fourth Amendment because Trooper Johnson invaded the curtilage of his small, urban home.**

The initial, warrantless search of Davalos's car was unlawful because Davalos was parked within his home's curtilage. The district court erred as a matter of law when it found that Davalos's car—which was parked a few feet from the corner of his home and

just outside the home's front window—was outside his home's cur-
tilage.

### 1. The Fourth Amendment's protection of the home extends to its "curtilage," but not "open fields."

The Fourth Amendment provides that "[t]he right of the people
to be secure in their persons, houses, papers and effects, against
unreasonable searches and seizures, shall not be violated …." U.S.
Const. amend IV. At the core of the Fourth Amendment stands the
"right of a [person] to retreat into [their] home and there be free
from unreasonable governmental intrusion." *Silverman v. United
States*, 365 U.S. 505, 511 (1961). But the Fourth Amendment's pri-
vacy protections do not begin or end at a home's literal walls. In-
stead, to give "full practical effect to that right," the Supreme Court
has recognized that such protections extend to the curtilage—"the
area 'immediately surrounding and associated with the home.'" *Col-
lins*, 584 U.S. at 592 (quoting *Florida v. Jardines*, 569 U.S. 1, 6
(2013)); 4 W. Blackstone, Commentaries on the Laws of England
*225 (1769) ("[T]he capital house protects and privileges all its
branches and appurtenants, if within the curtilage"); *Oliver v.
United States*, 466 U.S. 170, 180 (1984) ("[Blackstone's] distinction

implies that only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home").

"'The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.'" *Collins*, 584 U.S. at 592–93 (quoting *California v. Ciraolo*, 476 U.S. 207, 212–13 (1986)). Therefore, under the traditional property-based understanding of the Fourth Amendment, when a law enforcement officer "physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred." *Id*. at 593 (citing *Jardines*, 569 U.S. at 11). Such a search represents an "unlawful trespass" that the Fourth Amendment does not allow. *Id*. at 595; *see also Lange v. California*, 594 U.S. 295, 302–03 (2021).

While the Fourth Amendment protects a home's curtilage—a zone of real property surrounding a dwelling—it does not extend to the "open fields" that lie beyond it, which "do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance." *Oliver*, 466 U.S. at 179–80. That is because society does not recognize as reasonable an expectation in privacy in open fields where "activities

such as the cultivation of crops" occur or in "a thickly wooded area" that is unoccupied or undeveloped away from the curtilage. *Id.* at 179 (first quote), 180 n.11 (second quote). Thus, "an individual may not legitimately demand privacy for activities out of doors in fields, except in the area immediately surrounding the home." *Id.* at 178. In *Oliver*, for example, the Supreme Court had no difficulty applying the open fields doctrine to a field crop of marijuana over a mile from the petitioner's home. *Id.* at 173, 181. "[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." *Id.* at 182 n.12.

But the curtilage-open-fields distinction proved to be more difficult for large parcels of private property in rural or commercial settings. *See United States v. Dunn*, 480 U.S. 294, 302 (1987) (large rural ranch); *Dow Chemical Co. v. United States*, 476 U.S. 227, 239 (1986) (holding that open areas within Dow's 2,000-acre facility were more like an open field and not analogous to a home's curtilage). In *Dunn*, for example, the Supreme Court held that a barn, which was located 50 yards from the home's outer fence, was outside the curtilage of the home. 480 U.S. at 297–98, 301. To help

identify where the curtilage ended and the open field began, the Supreme Court identified four factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id*. at 301. Applying those four factors to the barn and the area surrounding it, this Court concluded "that this area lay outside the curtilage of the ranch house." *Id*. Yet the Supreme Court cautioned that there is no "finely tuned formula" or exclusive factors for determining whether an area constitutes curtilage. *Id*. And it stressed that these factors cannot be "mechanically applied." *Id*.

In an urban, residential setting, the Supreme Court has not used the *Dunn* factors to identify the area around the home as curtilage. In *Jardines*, the Supreme Court held that officers undoubtedly intruded upon a home's curtilage when they walked a drug-sniffing dog onto the home's unenclosed front porch because "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" 569 U.S. at 7 (quoting *Oliver*, 466 U.S. at 182, n.12); *cf. California v. Greenwood*, 486 U.S. 35, 37 (1988) (upholding the warrantless search of garbage,

noting that its placement at the street curb was "outside the curtilage of a home").

After determining that officers' investigation took place on the constitutionally protected curtilage, the Supreme Court examined whether those officers accomplished their investigation through an unlicensed physical intrusion. *Jardines*, 569 U.S. at 7. Because a home's front door knocker impliedly permits visitors to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," the officers were also impliedly invited to approach a home and knock on its front door because that is precisely the same invitation that is also extended to private citizens. *Id*. at 8. But the Supreme Court emphasized that there existed no similar license to bring a trained drug-sniffing dog to explore the home's curtilage in hopes of discovering contraband. *Id*.

> To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to — well, call the police.

*Id.* at 9. Accordingly, the Supreme Court held that the officers' unlicensed physical intrusion onto a home's front curtilage for the specific purpose of gathering evidence constituted a "search" within the meaning of the Fourth Amendment. *Id.*

In *Collins*, the Supreme Court applied *Jardines*—and not *Dunn*—and held that a residential home's driveway—just like a front porch, side garden, or "area outside the front window"—was curtilage, and the warrantless search of a motorcycle parked on that curtilage was not justified by the automobile exception to the Fourth Amendment's warrant requirement. 584 U.S. at 593–94. The police officers had a plain view from the street of a motorcycle that had been involved in multiple traffic infractions and evaded arrest. *Id.* at 589–90. Without a warrant, an officer walked to the top of a home's driveway, removed a tarp covering the motorcycle, and gathered its vehicle identification number and license plate. *Id.* Using that information to verify that the motorcycle was stolen, the officer arrested Collins. *Id.*

The Supreme Court first held that Collins's driveway was curtilage because Collins's driveway was adjacent to the home and within an area to which the home life extends, which made the

driveway analogous to a front porch, side garden, or space right out-side a front window. *Id.* at 593–94. Thus, the automobile exception to the Fourth Amendment's warrant requirement did not justify the invasion of the curtilage to search the motorcycle.[4] *Id.* at 594–601.

### 2. Davalos's car was parked within his home's curtilage.

While the *Dunn* factors may remain relevant for determining where curtilage ends and an open field begins, *Collins* and *Jardines* illustrate that, if the *Dunn* factors are utilized at all, they should "be evaluated with reference to the obvious attributes of an urban environment." *Horton v. United States*, 541 A.2d 604, 608 (D.C. Ct. App. 1988); *see also United States v. Acosta*, 965 F.2d 1248, 1256–

---

[4] This Court's "precedent applying the curtilage factors is sparse." *Sauceda v. Lopez*, 125 F.4th 634, 639 (5th Cir. 2025) (cleaned up). In *United States v. Beene*, 818 F.3d 157, 162 (5th Cir. 2016), this Court applied the *Dunn* factors and held that officers did not intrude upon the curtilage when they deployed a drug-sniffing dog around the defendant's car parked on his driveway. After concluding that the driveway was outside the curtilage, the Court distinguished *Jardines*, reasoning that a dog sniff in an open field is not a search. *Id.* at 163. Because *Beene* was decided before *Collins*, it is not directly controlling here. *See United States v. Holley*, 831 F.3d 335 n.4 (5th Cir. 2016) (Graves, J., dissenting) (noting that precedent has not "announce[d] a broad rule that a driveway is not part of a home's curtilage").

57 (3d Cir. 1992) (noting that *Dunn* factors are "not as useful analytically" in urban setting and holding that backyard was curtilage of defendants' apartment); *United States v. Romano*, 388 F. Supp. 101, 104 & n.5 (E.D. Pa. 1975) ("The concept of curtilage has been significantly modified when applied to a multiple dwelling"). That is because certain factors may be less determinative in a city setting because of the physical differences in the properties. *See Horton*, 541 A.2d at 608. It seems clear, for example, that "the configuration of the streets and houses in many parts of the city may make it impossible, or at least highly impracticable, to screen one's home and yard from view." *Id*. Failure to do so grants greater "constitutional rights to those persons with the financial means to afford residences with garages in which to store their vehicles" than those who do not. *Collins*, 584 U.S. at 601.

Since *Dunn*, the Supreme Court has twice resolved the curtilage question in a residential, urban setting without reference to *Dunn*. In *Jardines*, the Court made no mention of the *Dunn* factors before finding that "the front porch is the classic exemplar of an area adjacent to the home and to which the activity of home life extends," despite the absence of a boundary or enclosure. 569 U.S. at 7

(cleaned up). Similarly in *Collins*, the Court found that the unenclosed portion of a driveway, which was plainly visible from the street, constituted curtilage. 584 U.S. at 597, 600.

Even if the *Dunn* factors do apply, evidence presented at the suppression hearing established that the portion of the driveway where Davalos was parked—immediately next to the home and just outside his home's front window—was intimately tied to the home and deserved Fourth Amendment protection. Yet, the district court mechanically applied the *Dunn* factors to determine that his driveway was more analogous to an open field than curtilage. That was error.

*First*, the car was in close proximity to the home. For a "modern urban" house, "the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling." *United States v. Arboleda*, 633 F.2d 985, 992 (2d Cir. 1980) (quoting *Commonwealth v. Thomas*, 267 N.E.2d 489, 491 (Mass. 1971)). Here, the front of Davalos's car was within a few feet of his home, nearly parallel with the home's front porch, and immediately outside the front window. *See*, *supra* at 5, Gov't Ex. 1 (00:37); *see also Collins*, 584 U.S. at 593; *Jardines*, 569 U.S. at 4; *Morgan v. Fairfield County*, 903 F.3d 553,

559, 561 (6th Cir. 2018) (holding officers' trespass onto home's curtilage—an area approximately five-to-seven feet from the house—was not justified).

Yet the district court held that the car could not be in close proximity to the home because it was "in front of the house and to the side of it." ROA.167. But a home's curtilage includes "*all* its branches and appurtenants," 4 W. Blackstone, Commentaries on the Laws of England *225 (emphasis added), including the area in front of the house and within a person's plain view of the street, not just those areas behind or to the side of the home. *Collins*, 584 U.S. at 593 (open-faced driveway enclosure was within curtilage "'[j]ust like the front porch, side garden, or area 'outside the front window'") (quoting *Jardines*, 569 U.S. at 6). It was error to conclude that the first factor—proximity to the home—weighed against Davalos.

*Second*, whether there is an enclosure should carry no weight in a city setting. The district court mechanically concluded that "[n]o enclosure" means the driveway is more of an "open field" than a home's curtilage. ROA.167. Not so. Certain *Dunn* factors "may be less determinative in a city setting because of the physical differences in the properties." *Acosta*, 965 F.2d at 1256; *see also United States v. Alexander*, 888 F.3d 628, 633 (2d Cir. 2018) (explaining

that the "second *Dunn* factor [is] a less useful concept in this particular residential setting"). That is true here. Given the urban, residential nature of Davalos's property, whether his driveway was enclosed is not a necessary condition to finding that the area constitutes curtilage and should carry little weight, if any, in the analysis.

In *Dunn*, the Supreme Court's focus—whether the area searched was within an enclosure surrounding the home—was fitting given the rural landscape—a nearly 200-acre ranch. 480 U.S. at 297, 302. The Supreme Court concluded that the second factor cut against a finding of curtilage because the barn was located 50 yards—half a football field—beyond the interior fence. *Id*. at 302.

But, given the nature of Davalos's property and neighborhood—modest homes located on a residential street in the middle of city, none of which were enclosed—it "is unlikely that a property as small as [Davalos's] would be subdivided like the property in *Dunn*." *Alexander*, 888 F.3d at 633 (holding that portion of driveway was curtilage even where property was not fully enclosed and there was no fencing in the front of property); *see also Rowley v. McArthur*, 2018 WL 6788528, at *5 (D. Utah Dec. 26, 2018) (rejecting argument that driveways must be fully enclosed to constitute cur-

tilage and finding that unenclosed portion of driveway was curtilage). And Davalos did what is "easily understood from our daily experience"—he pulled past the public sidewalk onto his private property and as close to his house as was physically possible. *See Dunn*, 480 U.S. at 302; *Jardines*, 569 U.S. at 7; *see also United States v. Diehl*, 276 F.3d 32, 40 (1st Cir. 2002) (explaining that *Dunn* does not require an "artificial enclosure"). Thus, the absence of an enclosure in this urban context should carry no weight.

*Third*, the driveway's use demonstrates an intimate link between the driveway and Davalos's home. The district court did not discuss the third factor. *See* ROA.167–68. But like the other *Dunn* factors, proximity of the driveway to the house closely links the area's uses to "the intimate activity associated with the sanctity of [Davalos's] home and the privacies of life." *Oliver*, 466 U.S. at 180 (internal quotation marks omitted). That is because the curtilage doctrine was developed to ensure protection for these kinds of places that are "physically and *psychologically*" linked to the home. *Collins*, 584 U.S. at 592–93 (cleaned up) (emphasis added). And courts have repeatedly recognized as much. *See, e.g., Rowley*, 2018 WL 6788528, at *5 (finding unenclosed portion of driveway was intimately linked to the home); *Alexander*, 888 F.3d at 628, 633–34

(finding "home life extend[ed]" to driveway); *Horton*, 541 A.2d at 609 (explaining that "in an urban area, substantial weight may have to be accorded the uses to which one's real estate is put, for actual use of the yard and related property is likely to be the primary way in which one asserts an intimate tie to the home").

*Finally*, *Collins* and *Jardines* dictate that visibility is not dispositive. Yet, the district court found, as to the fourth *Dunn* factor, that "[n]o special measures appear to have been taken to protect the area in question from public view or access." ROA.168. Again, this conclusion ignores the urban, residential setting of Davalos's humble home. The curtilage of a home need not be completely shielded from public view. Homeowners "may expose portions of the curtilage of [their] home[s] to public view while still maintaining some expectation of privacy in those areas." *United States v. Wells*, 648 F.3d 671, 678 (8th Cir. 2011).

Both *Collins* and *Jardines* made clear that complete obstruction of observation is not required. *See Collins*, 584 U.S. at 600 (ruling that the parking patio "into which an officer can see from the street is no less entitled to protection from trespass and a warrantless search than a fully enclosed garage"); *Jardines*, 569 U.S. at 7 (observable front porch constituted curtilage). A finding otherwise

"would grant constitutional rights to those persons with the financial means to afford residences with garages in which to store their vehicles but deprive those persons without such resources of any individualized consideration as to whether the areas in which they store their vehicles qualify as curtilage." *Collins*, 584 U.S. at 601.

Indeed, in the residential city setting, "the mere fact that [Davalos's] driveway was not fully surrounded by a fence and was visible from the street does not make that area, which directly abutted the house … fair game for warrantless and suspicionless police inspection or patrol." *Alexander*, 888 F.3d at 635; *see Jardines*, 569 U.S. at 6 (the Fourth Amendment's protection of the home "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity").

Like the second *Dunn* factor, courts have questioned the fourth factor's relevance in the city setting. For example, in *Acosta*, the court observed that "the configuration of the streets and houses in many parts of the city may make it impossible, or at least highly impracticable to screen one's home and yard from view." 965 F.2d at 1256 (quoting *Horton*, 541 A.2d at 608). Other courts have also refused to give this factor controlling weight in similar settings. *See, e.g., Wells*, 648 F.3d at 678; *Alexander*, 888 F.3d at 635. Thus, even

31

if this Court finds that this factor weighs against a curtilage finding or is inconclusive, it should be given little weight.

* * * *

In sum, the district court's conclusion that Davalos's car was not parked within the home's curtilage suffered many errors. Despite the Supreme Court's admonition that "mechanical application of [the *Dunn* factors] in isolation is inappropriate to determine curtilage," 480 U.S. at 301, the district court rigidly applied the factors, focusing almost exclusively on the driveway's lack of enclosure and visibility. *See* ROA.167–68; *cf. Acosta*, 965 F.2d at 1256. Notably, these two factors have minimal, if any, relevance in the residential city setting—like here—where lots are small and driveways are not shielded from observation. Yet, the court gave no consideration to the city setting. And the district court's conclusion that Davalos's car was not proximate to the house because it was in front of it ignores the long-held understanding that curtilage also exists in front of a house. *Collins*, 584 U.S. at 593; *Jardines*, 569 U.S. at 6. When given proper consideration, the overwhelming evidence established that the portion of the driveway where the car was parked was within the home's curtilage.

If curtilage carries the same protections as the home, *Collins*, 584 U.S. at 592–93, and humble homes carry as much Fourth Amendment protection as mansions, *Miller v. United States*, 357 U.S. 301, 307 (1958), then humble curtilage should carry the same Fourth Amendment protections as the far-from-the-street, high-wall-enclosed, view-shielded curtilage of wealthier homes.[5] The district court's conclusion that Davalos's car was parked outside the home's curtilage was erroneous and should be reversed.

### C. No exception to the Fourth Amendment's warrant requirement justified Trooper Johnson's invasion of the curtilage.

The district court alternatively held that, even if Trooper Johnson had invaded the curtilage of Davalos's home to conduct an unlawful search of his car, he was justified to conduct a protective sweep for officer safety and because he was in "hot pursuit" of Davalos. ROA.169–71. That too was error.

Assuming the driveway was on the curtilage, and thus part of Davalos's "house," then the Fourth Amendment "generally requires

---

[5] Davalos's was parked within the curtilage, but the driveway was not connected to the front door. *See* ROA.284–86; Def. Ex. 2. Thus, Trooper Johnson did not have an implied license to intrude upon the constitutionally protected area to search the car. *Jardines*, 569 U.S. at 8–9.

the obtaining of a judicial warrant before a law enforcement officer can enter a home without permission." *Lange*, 594 U.S. at 301 (cleaned up). But the "warrant requirement is subject to certain exceptions." *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Any such warrantless searches, however, must be reasonable and tailored in scope to the justification. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). Here, the district court found that two exigencies justified Trooper Johnson's invasion of Davalos's constitutionally protected space—a protective sweep based on officer safety and because Trooper Johnson was in "hot pursuit" of Davalos. ROA.169–71. Neither exigency justified the search.

### 1. There was no reasonable, articulable suspicion that the officers were in danger.

Under certain circumstances, law enforcement can conduct a "protective sweep" of a home. *See United States v. Gould*, 364 F.3d 578 (5th Cir. 2004), *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452 (2011). Traditionally, a protective sweep was "a quick limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Buie*, 494 U.S. at 327.

This Court has since recognized that protective sweeps may be permissible even without an arrest, if officers are otherwise lawfully in a home. *Gould*, 364 F.3d at 584.

Thus, a protective sweep is lawful if: (1) officers have a "legitimate law enforcement purpose" for being in the home; (2) it is "supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene"; (3) the sweep is "no more than a cursory inspection of those spaces where a person may be found"; and (4) the sweep lasts "no longer than is necessary to dispel the reasonable suspicion of danger" and lasts "no longer than the police are justified in remaining on the premises." *Id*. at 587 (cleaned up).

*First*, the district court found that the warrantless entry of Davalos's curtilage was a lawful "protective sweep" because Trooper Johnson's initial entry onto the curtilage was justified. Not so. The facts known to Trooper Johnson at the time did not satisfy the exigent circumstances exception as a matter of law.

Officers may enter a person's home without a warrant if they can show both exigent circumstances *and* probable cause that contraband is inside or a crime is taking place. *United States v. Newman*, 472 F.3d 233, 236 (5th Cir. 2006). This type of warrantless

entry is permissible only if "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *United States v. Daniels*, 930 F.3d 393, 400 (5th Cir. 2019) (cleaned up). Exigent circumstances and probable cause are separate inquiries.

There is "no set formula for determining when exigent circumstances may justify a warrantless entry," *Newman*, 472 F.3d at 237 (citations omitted), but this Court employs a five-factor test to determine whether exigent circumstances support a warrantless entry:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) the information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of it and to escape are characteristics in which those trafficking in contraband generally engage.

*United States v. Aguirre*, 664 F.3d 606, 611 (5th Cir. 2011) (quoting *United States v. Mata*, 517 F.3d 279, 287 (5th Cir. 2008)).

Here, the Government failed to meet its burden. None of the exigency factors supported Trooper Johnson's warrantless entry of

Davalos's curtilage. Most notably, there was no reason to believe that somebody else was inside Davalos's car. Davalos had been under surveillance while he ran errands, but at no time did Trooper Johnson testify that he received any information from the surveilling agents that someone else was in the car. Davalos had parked his car at his house and was in the process of getting out when Trooper Johnson initiated his lights and the traffic stop. ROA.256–57, 260; Gov't Ex. 1 (clip 1 at 00:01–00:02, 00:10–00:18). But there was no activity on the passenger side of Davalos's car. And, when Trooper Johnson told Davalos to tell any passenger to exit, Davalos responded that "nobody" else was in the car. Gov't Ex. 1 (clip 1 at 00:07–00:12). Because Trooper Johnson had received no reports that the surveilling agents observed a passenger in the car and there was no objective evidence that anyone else was in the car, Trooper Johnson lacked sufficient reason to believe anyone else was in Davalos's car or that there was a particularized danger. *See United States v. Menchaca-Castruita*, 587 F.3d 283 (5th Cir. 2009) (holding that exigent circumstances were not present testimony from officer about general concerns for safety); *Morgan*, 903 F.3d at 562–63 ("generic possibilities of danger cannot overcome the required particularized showing of a risk of immediate harm"); *United*

*States v. Carter*, 360 F.3d 1235, 1242 (10th Cir. 2004) (noting that risk in the context of an arrest in the home is "substantially diminished when the officers effect the arrest outside the home" and government failed to point to specific, articulable facts suggesting that the outdoor areas harbored anyone who posed a danger to them).

In *Menchaca-Castruita*, for example, the Court distinguished cases where police had articulable reasons to believe somebody was in the home, like audible voices inside or reliable tips. *Id.* at 292–93. But in *Menchaca-Castruita*, law enforcement knew that the suspect had fled, there were no reports of accomplices or anybody else inside, and bystanders had been removed. *Id.* at 292, 295. The Court explained: "[t]here will always be some *possibility* that an unknown person might be hiding somewhere inside a residence," but an exigent circumstance finding requires more. *Id.* at 295. It "must be based on an officer's reasonable belief that the delay necessary to obtain a warrant will facilitate the destruction or removal of evidence or put officers or bystanders in danger." *Id.* at 295–96.

Here, there was no evidence that justified a reasonable belief that a danger existed. *See Buie*, 494 U.S. at 337 (allowing a protective sweep of a house during an arrest where the officers have "a reasonable belief based on specific and articulable facts that the

area to be swept harbors an individual posing a danger to those on the arrest scene"); *Terry*, 392 U.S. at 30 (requiring a reasonable and articulable suspicion of danger to justify a patdown search); *Cooper v. Brown*, 844 F.3d 517, 522–23 (5th Cir. 2016) (examining whether a suspect posed an immediate threat to the safety of the officers or others). There was no articulable evidence that Davalos had a passenger, and Davalos behaved in a non-threatening way. He was not suspected of committing a violent act (only a minor traffic violation), he was civil in his tone and actions, he kept his hands within Trooper Johnson's sight line, and he readily complied with Trooper Johnson's instructions. ROA.258, 260; Gov't Ex. 1 (clip 1 at 00:05–00:07). That leaves only Trooper Johnson's general safety concern about the car's tinted windows. *See* ROA.258, 262. But tinted or heavily tinted windows alone do not rise to the level of reasonable suspicion of illegal activity. *United States v. Guerrero-Barajas*, 240 F.3d 428, 433 (5th Cir. 2001).

*Second*, Trooper Johnson lacked probable cause of an active crime or contraband inside the car. Even under exigent circumstances, law enforcement must also show "probable cause that contraband is inside or that an illegal act is taking place" before entering without a

warrant. *Newman*, 472 F.3d at 236. Probable cause exists when under the "totality of the circumstances ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 237 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Probable cause did not support the warrantless entry of Davalos's curtilage to search the car. The only evidence on which Trooper Johnson based his traffic stop was Davalos's failure to signal a lane change—minor traffic violations. ROA.254–55, 271, 288. While Trooper Johnson had probable cause to seize Davalos for the traffic violation, he accomplished this when he ordered him to the street and Davalos peaceably complied. ROA.258, 260; Gov't Ex. 1 (clip 1 at 00:05–00:07). Trooper Johnson confirmed he had no evidence that contraband was in the car or that Davalos was actively engaged in a crime.[6] *See* ROA.288. Again, if tinted windows alone do not support reasonable suspicion of illegal activity, the did not support the

---

[6] The district court's finding that the bag in the trunk justified the stop, ROA.169, was clearly erroneous based on Trooper Johnson's unequivocal testimony that putting a plastic bag in the trunk (the contents of which were unknown) was not probable cause to search the car. ROA.288.

higher standard of probable cause. *Guerrero-Barajas*, 240 F.3d at 433.

Therefore, the district court erroneously concluded that Trooper Johnson was justified to invade Davalos's curtilage to search his car based on a general concern for officer safety.

### 2. There was no "hot pursuit" of Davalos.

The district court also held that Trooper Johnson's "hot pursuit" of Davalos justified his warrantless entry onto Davalos's curtilage. ROA.170–71. Not so. There is no rule categorically allowing the pursuit of a fleeing misdemeanor suspect. *Lange*, 594 U.S. at 306–307. Indeed, the "hot pursuit" exigency "in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense is involved." *Id.* at 306–07.

Here, Trooper Johnson had probable cause of only minor traffic violations. This alone does not justify his invasion of the constitutionally protected area of the home. *Id.* And, there was no flight. Davalos had returned home and parked by the time Trooper Johnson initiated his lights. ROA.256, 272–77, 293–94; Gov't Ex. 1 (00:30 and clip 1); Def. Ex. 1 (01:49–01:57). Davalos did not flee, but rather peaceably followed Trooper Johnson's instructions. ROA.258, 260; Gov't Ex. 1 (clip 1 at 00:05–00:07).

The district court's reliance on *Scher v. United States*, 305 U.S. 251 (1938), was misplaced. In *Scher*, officers followed a driver based on a reliable tip that the driver was transporting bootleg liquor. *Id.* at 253. Officers followed the driver into a garage and asked him if he was transporting illegal substances and the driver admitted he was. *Id.* Officers then searched the vehicle, and the search was upheld. *Id.* & at 255. But years later, when the Supreme Court expressly examined the automobile exception's application to a motorcycle parked on the curtilage of a home, the Court criticized the old case's reasoning and concluded it was "factbound" and not controlling. *Collins*, 584 U.S. at 598–99. *Scher* is also not controlling here. In particular, the officers in *Scher* had evidence *before* the search that the car contained contraband—Trooper Johnson did not. *See* ROA.288; Part C.1, *above*. *Lange* controls the outcome here, not *Scher*.

* * * *

Davalos was parked on the driveway of his small, urban home—within feet from the home's front corner and just outside its front window. As an area immediately next to the home, the car was within its curtilage, and Trooper Johnson invaded that constitutionally protected area to conduct a warrantless search of the car.

This warrantless search was not justified. There were no reasonable, articulable facts that any other person was in the vehicle or that Davalos presented a reasonable danger to the officers. And there was no probable cause that Davalos was engaged in criminal activity or possessed contraband—he was stopped simply for failing to signal a lane change. The district court's conclusions to the contrary are wrong as a matter of law. This Court should reverse the order denying Davalos's motion to suppress evidence derived from the initial, illegal search of his car,[7] and vacate his conviction.

––––––––––––––––––

[7] The district court made no finding that the exclusionary rule should not apply, and Trooper Johnson did not testify that he would have discovered the evidence under an alternative line of investigation or pursuant to a subsequent warrant. *See United States v. Cherry*, 759 F.2d 1196, 1205–07 (5th Cir. 1985); *see generally Murray v. United States*, 487 U.S. 533 (1988).

## Conclusion

The Court should reverse the district court's order denying Davalos's motion to suppress, vacate Davalos's conviction, and remand for further proceedings.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Kristin L. Davidson
KRISTIN L. DAVIDSON
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellant*

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,601 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Kristin L. Davidson
KRISTIN L. DAVIDSON
*Attorney for Defendant-Appellant*

Dated: March 20, 2025